IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GARY LUCKETT, TANYA CARTER, | ) | |
| KIMBERLY COLLIER-BOND, | ) | |
| SKYLAR LIPSCOMB, ADRIAN BOVIA, | ) | |
| and NATALIE STINSON, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 01 C 8967 |
| | ) | |
| MENASHA MATERIAL HANDLING | ) | |
| CORP., NATIONAL CONSOLIDATION | ) | |
| SERVICES, and ORBIS, | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

The plaintiffs are former and current African-American employees of defendant Menasha Material Handling Corporation. The employees claim that Menasha discriminated against them based on their race in violation of Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. Menasha and its related entities, who are also named as defendants, seek summary judgment under Fed. R. Civ. P. 56 on all of the plaintiffs' individual claims. The defendants also move to strike in its entirety the plaintiffs' joint response to the motion for summary judgment. For the following reasons, the defendants' motion to strike is denied and the motion for summary judgment is granted.

## I.     Background

Plaintiffs Gary Luckett, Adrian Bovia, Skylar Lipscomb, Natalie Stinson, Tanya Carter, and Kimberly Collier-Bond all worked for defendant National Consolidation Services ("NCS"),

which was eventually acquired by Menasha. NCS received goods from vendors, warehoused them, and then re-shipped the goods, mostly to distribution centers for Walgreens drug stores.

From the employees' perspective, conditions at work began to go downhill when Menasha acquired NCS in July 2000. After the acquisition, Menasha closed the former NCS facility in Glenwood, Illinois, and transferred its predominantly African-American workforce to its existing facility in Alsip, Illinois, where employees were predominantly white and Hispanic. The plaintiffs allege that upon transferring to Alsip they received a hostile reception. They contend that they were subjected to racial slurs, disciplined more harshly than non-African-American employees, and in some cases demoted, passed over for promotions, and even constructively discharged. Menasha attributes the plaintiffs' dissatisfaction to new management's non-discriminatory efforts to stem the losses that NCS had been experiencing—$1.5 million per year—through improved leadership, increased accountability, and reduced costs.

Each plaintiff sets forth distinct allegations of discrimination.

### 1. Gary Luckett

NCS hired Gary Luckett as a shipping clerk in 1999. By all accounts Luckett excelled and, shortly before the acquisition of NCS by Menasha, he was promoted to the position of dispatch supervisor. After the acquisition, Menasha retained Luckett in his same position and at the same rate of pay. Nevertheless, because of uncertainty over what type of employer Menasha would be, Luckett began looking for another job. Luckett found one offering better pay and submitted a letter of resignation, but ultimately decided to stay with Menasha after it matched the pay offer he had received.

Within weeks of Luckett's decision to stay, Menasha hired John Brady to be its new manager of carrier logistics and Luckett's new supervisor. Brady had 30 years' experience in management and carrier logistics. Luckett claims that after Menasha hired Brady, it demoted him by giving most of his supervisory responsibilities to Brady, including the responsibility for selecting carriers and assigning pickups. Menasha also transferred shipping clerk Kimberly Collier-Bond from the dispatch department to the billing department, and as a result Luckett no longer supervised her and was given her former duties. Luckett contends that Menasha also excluded him from management meetings. But despite the changes, Luckett's title, pay and benefits remained the same.

Displeased with the changes Menasha made to his day-shift dispatch position, Luckett attempted to transfer to the night-shift dispatch supervisor position, but that position was not vacant and his request to transfer was denied. Following the denial, Luckett contends that Menasha began to make conditions at work unpleasant for him. Specifically, he asserts that a supervisor, Laurence Marek, refused to discuss the changes in Luckett's job duties on five separate occasions, questioned Luckett on petty matters (such as asking why a door was left open), told him during a sales meeting that his input was no longer needed, and yelled at him for failing to use a proper form for noting an employee's late arrival. Luckett also complains that he was forced to record his time and request permission to work overtime because he was an hourly employee, rather than salaried like the night-shift dispatch supervisor.

By January 2001 Luckett decided that his situation at Menasha had become so unbearable that he quit. On June 15, 2001 he filed a charge of discrimination with the EEOC and Illinois Department of Human Rights. In it, he alleged that based upon his race, he was

3

demoted, and subjected to discriminatory discipline and a hostile work environment. After receiving a right-to-sue letter in October 2001, he joined the other plaintiffs in filing the complaint (presently before the court is the amended complaint) alleging race discrimination. In Count XV of the amended complaint, Luckett alleges discrimination based upon his demotion, while in Count XVI he alleges discriminatory discipline and a hostile work environment. In response to the defendants' motion for summary judgment, Luckett also raises a claim that he was not paid for overtime he worked.

### 2.  Adrian Bovia

Adrian Bovia worked as a dock supervisor. His responsibilities included ensuring that loaded trailers were secured each night by parking and locking empty trailers in front of them, a practice Menasha implemented as part of a new overnight security policy following the theft of two trailers.

Although Bovia acknowledges understanding the new overnight security policy, he admittedly violated the policy on several occasions. In October 2000 he failed to properly lock a trailer, for which he received a written reminder of Menasha's overnight security policy. The following week, an employee lost Bovia's key to the trailers, which Bovia had given him in violation of written company policy prohibiting keyholders from giving their keys to other employees. Bovia was not disciplined for this infraction.

In March 2001, Menasha fired Bovia after he failed to make sure that a subordinate had blocked-in a loaded trailer, and the trailer was stolen. Although Bovia admits his transgression, he contends that his supervisor, Manny Paredes, told him not to bother blocking-in the trailer because it was loaded with nothing but "junk." Paredes denies the statement. The subordinate

Bovia had placed in charge of blocking the trailer was not fired because Bovia was ultimately responsible for properly securing the trailers each night.

Bovia believes that his termination was discriminatory for several reasons. First, he asserts that the trailer could only have been stolen with a key, four other employees had keys to the stolen trailer, and Menasha terminated the only black keyholder. Second, he notes that another trailer was stolen for which he was not responsible and no one was terminated as a result of that theft. Third, Bovia contends that under Menasha's progressive discipline policy, he should have first received a suspension, not termination. Finally, according to Bovia, Menasha's decision to terminate him came shortly after he had complained to higher-ups about the company's allegedly unfair treatment of African-Americans.

Bovia concedes, however, that Menasha may have had a non-discriminatory reason for choosing to believe Paredes over him: office "politics." Specifically, as Bovia explained in his deposition, "It is like a chain of command. Are you going to get on your operations manager's case for doing this, or are you going to go on to him and get on his supervisor's case for doing it? If you do your operations manager, it means that you guys made a bad decision that's going to make your management . . . look bad, that you had bad judgment in hiring an operations manager."

Bovia also complains that Menasha treated non-African-American employees better than him. Specifically, he contends that Tracy Smith, a white employee, was permitted time off for personal matters, while he was not. He does not identify in which department Smith worked at the time, or which supervisor approved her time off.

5

Bovia filed a charge of discrimination with the EEOC and Illinois Department of Human Rights on June 14, 2001, and received a right-to-sue letter. In the amended complaint, he repeats the allegations that he had made in his charge of discrimination, specifically that he was terminated (Count IV) and subjected to disparate treatment (Count V) based upon his race.

### 3. Skylar Lipscomb

Skylar Lipscomb worked as a dock foreman for NCS and then Menasha, where he was the self-proclaimed "Michael Jordan" of truck loaders. In September 2000, Lipscomb took over some of the supervisory duties previously performed by first-shift dock supervisor Keith Eady after Eady was fired. Lipscomb also applied for Eady's former job. Less than a month later, however, Menasha hired Chuck Mackin, who is white, to fill Eady's job. Although Lipscomb concedes that Mackin was hired because of his years of experience in the transportation industry, specifically in dock supervision, Lipscomb believes that Menasha failed to promote him into the supervisor vacancy because he is African-American. Lipscomb also contends that Menasha demoted him by taking from him the supervisory duties he temporarily performed while Menasha searched for Eady's permanent replacement.

Lipscomb contends that he was denied a promotion a second time after second-shift dock supervisor Adrian Bovia was fired in April 2001. But Lipscomb admits he did little to express interest in Bovia's job. For instance, Lipscomb never applied for the opening as he had for the vacancy created when Eady was fired. And although Lipscomb says that he expressed interest in the Bovia vacancy to two Menasha employees, he admits that he did so only in passing, and that one of the employees had no authority to fill the vacancy, while the other never acknowledged hearing him.

6

Menasha also limited Lipscomb's opportunity to work overtime based upon race, according to Lipscomb. To cut costs, Menasha required employees to obtain permission to work overtime. While this reduced Lipscomb's overtime from at least two hours per shift to just an hour here-and-there, Lipscomb contends that non-African-American employees' requests for overtime were routinely granted. But the only non-African-Americans he asserts worked more overtime than him were lower paid Tech I employees, while Lipscomb was a Tech II employee who earned more per hour than any Tech I employee.

Lipscomb also asserts that he was punished more harshly than non-African-Americans when he violated company policy. In one instance, he received a Disciplinary Action Form after failing to properly date one of his time cards. He identifies a Hispanic employee who committed a similar time card violation, but the only evidence he offers that the Hispanic employee was not disciplined is his own speculation. Other violations included driving a forklift within a couple of feet of a supervisor—for which he was warned verbally but not in writing—improperly backing a forklift down a ramp, and signing a dock ticket that misreported the number of pallets that had been loaded onto a truck—both of which resulted in Disciplinary Action Forms. Although Lipscomb contends that Menasha would have overlooked these policy violations had they been committed by non-African-Americans, he offers no evidence to support his contention.

On June 25, 2001, Lipscomb filed a charge of discrimination with the EEOC and the Illinois Department of Human Rights alleging that he was demoted, passed over for a promotion, and subjected to a hostile work environment because he is African-American. According to Lipscomb, a short time later Menasha began retaliating against him for filing the charge. First,

7

he contends, Menasha suspended him for one day. He admits, however, that he received the suspension for cursing at two supervisors after they talked to him about improperly loading a trailer.

Next, Lipscomb alleges that Menasha changed his work hours against his wishes, requiring him to start each morning at 6:45 rather than 10:00. Lipscomb complained and, according to Menasha, threatened a supervisor. Although Lipscomb denied threatening the supervisor, he nevertheless received a three-day suspension. The alleged retaliation continued the following month when a supervisor documented a mistake Lipscomb made while loading a trailer and humiliated Lipscomb by making him initial the document in front of coworkers. He contends that later that day, a Hispanic employee made the same error while loading a trailer during the night shift but was not immediately disciplined. But he admits that after coworkers brought to a supervisor's attention the other employee's error, the supervisor discussed the error with her, and that he does not know whether or not she received additional punishment.

On August 24, 2001, the EEOC issued Lipscomb a right-to-sue letter. Lipscomb repeats in his complaint the allegations he raised in his discrimination charge—failure to promote (Count XI), discriminatory discipline and a hostile work environment (Count XII), and wrongful demotion (Count XIII) based upon race, and adds a claim that Menasha retaliated against him for filing his EEOC charge with more discriminatory discipline (Count XIV).

### 4.    Natalie Stinson

Plaintiff Natalie Stinson began working for NCS as an hourly employee in its customer service department, where she performed clerical work including data entry. NCS eventually

8

promoted Stinson to supervisor, but she remained an hourly, as opposed to salaried, employee. The parties dispute what authority Stinson had as supervisor. Stinson contends that she supervised both the flow of paperwork in the customer service department as well as the department's other employees; the defendants say she was merely in charge of the flow of paperwork, not in charge of employees. After Menasha bought NCS, Stinson retained her position in the customer service department. Menasha continued to pay her hourly, which, according to Stinson, made her the only supervisor who was not salaried.

Stinson charges that she was passed over for a promotion to office manager in July 2001 when Menasha gave the job to Tanya Burderlik, a white employee who had been working as claims manager. Stinson asserts that she wanted to be office manager and would have applied for the vacancy had Menasha posted it. She charges that Menasha purposely failed to post openings so that African-American employees could not apply for them. She admits, however, that she never expressed interest to any manager in being considered for a promotion or different job.

Burderlik carried out her supervision of Stinson and the other employees in the customer service department more aggressively than her predecessor had. For instance, she noted employees' tardiness and unexcused absences, enforced Menasha's dress code, and set lunch and break schedules. As a result, Stinson believes that her authority to supervise the other customer service employees had been usurped, resulting in a demotion.

Stinson believes that she was demoted a second time when some of her responsibilities for paperwork were given to another employee, Tracy Smith. In January 2002, Smith transferred

9

from the operations department to customer service, partly to ease the customer service department's workload and partly to separate Smith from John Brady, whom she accused of sexually harassing her. As a result of Smith's transfer, the duties of all customer service employees were shuffled. Although Stinson's duties changed as a result of the shuffling, she admits that her salary and benefits remained the same, and that Menasha reassured her that she had not been demoted.

In addition to being passed over for a promotion and demoted, Stinson complains that she was disciplined disproportionately compared to non-African-Americans. For example, Burderlik issued her written warnings for failing to provide a Billing Error Log on two occasions. Although Stinson admits her errors, she contends that written warnings were a harsher form of discipline than a non-African-American would have received. She does not, however, identify any non-African-American who received more favorable treatment for a similar violation. Stinson contends that she was also punished disproportionately for violating Menasha's dress code. On two separate occasions Stinson received written warnings in her personnel file for wearing denim jeans to work. Stinson notes that non-African-American employees in other departments were not punished for wearing denim to work, but those employees wore denim shirts and only denim jeans were prohibited.

Stinson describes other instances in which she says she received hostile treatment because she is African-American. In one instance, she contends that she and other African-American employees did not receive a shirt with the Menasha logo on it even though non-African-American employees received them. In another instance, she complains that Menasha

10

prevented her and other African-American employees from taking a shortcut to the lunchroom through the facility's office by denying her the office door's access code. As a result she was forced to take the long way to lunch. She also complains that as an hourly employee she needed permission to work overtime, even though supervisors who were salaried did not.

Stinson first filed a charge of discrimination with the EEOC on September 27, 2001, which she amended on October 3, 2001, and cross-filed with the Illinois Department of Human Rights. In her amended charge, she alleged that Menasha discriminated against her based upon her race by failing to promote her, by requiring the employees she supposedly supervised to report to a different supervisor, and by subjecting her to discriminatory discipline and a hostile work environment.

On December 20, 2001, Stinson received a right-to-sue letter. In plaintiffs' amended complaint, she repeats her allegations that Menasha discriminated against her by failing to promote her (Count XVII), by subjecting her to discriminatory discipline and a hostile work environment (Count XVIII), and demoted her based upon her race (Count XIX). Stinson also adds a claim not in her EEOC charge that she was paid less than comparable employees based upon her race (also Count XIX).

### 5.    Tanya Carter

Like Stinson, Tanya Carter also worked in Menasha's customer service department, where she performed customer billing and data entry. Also like Stinson, she contends that she was disciplined more harshly and treated less favorably compared to non-African-American employees. Specifically, Carter asserts that office manager Burderlik only logged the billing and

11

data entry errors committed by Carter and other African-American employees. As a result of the logged errors, Burderlik repeatedly warned Carter about her errors and ultimately imposed a one-week suspension. In contrast, Carter contends, Burderlik ordered that errors made by non-African-American employees be corrected and not logged. Carter identifies Amy Bennett as a similarly situated white employee whose errors were never logged.

Carter also contends that she was disciplined more harshly than non-African-American employees for violating the dress code. On one occasion, Burderlik sent Carter home without pay for wearing knee-high stockings in violation of the dress code. Carter contends that a white employee who also wore knee-high stockings was not sent home, but admits that the employee—Lorraine Niew—worked in a different department and reported to a different supervisor.

In addition to receiving less favorable treatment because of her race, Carter alleges that Menasha failed to promote her. Two positions opened that Carter says she would have applied for—an administrative assistant position and a supervisor position—but Carter contends that she could not do so because Menasha did not post openings. Carter concedes, however, that she never expressed any interest in being promoted.

Carter also contends that she was subjected to a hostile work environment. For instance, she alleges that supervisors referred to her as "you people," spoke to her like a child, and on some occasions refused to speak to her at all. She concedes, however, that she never heard a supervisor make a statement derogatory towards blacks. She also alleges that the telemarketing employees (who were all white) were allowed to eat lunch together and were allowed longer

12

lunches by combining their 30-minute lunch break with their 15-minute afternoon break, while customer service employees (who were predominantly African-American) could not eat together and could not combine breaks. Finally, Carter repeats Stinson's allegation that Menasha created a hostile environment by forcing customer service employees to take the long way from their work stations to the lunchroom by denying them the key code needed to take a shortcut through the office.

Carter first filed a charge of discrimination with the EEOC and Illinois Department of Human Rights on September 17, 2001, which she amended on October 23, 2001. In the amended charge, she alleged that Menasha discriminated against her based upon her race by failing to promote her, and by subjecting her to discriminatory discipline and a hostile work environment. In the amended complaint, Carter repeats her allegations that Menasha failed to promote her (Count VI) and subjected her to discriminatory discipline and a hostile work environment (Count VII).

### 6. Kimberly Collier-Bond

Kimberly Collier-Bond began working as a clerk in NCS' dispatching department in July 2000. When Menasha bought NCS a month later, it transferred her to the customer service department to do data entry. The following year, the position of second-shift supervisor opened in Collier-Bond's former department, the dispatch department. Collier-Bond contends that she would have applied for the position had she known about it. But Menasha never posted the opening before hiring Tracy Smith, who as noted earlier is white.

In January 2002, Menasha again adjusted Collier-Bond's duties by requiring her to serve as a file clerk after Smith transferred from the dispatch department and took over some of Collier-Bond's data entry responsibilities. Collier-Bond perceived the change to be a demotion, but admits that her pay and benefits were unaffected.

Collier-Bond also asserts that she was subjected to a hostile work environment. Specifically she alleges that she heard a supervisor refer to her as "you people," and that a supervisor yelled "You hate me" at her after she took issue with his comments on her performance evaluation. Collier-Bond, however, does not contend that any of these comments were racially motivated. The only racially motivated comment she describes is one made by Smith to a temporary worker, warning the temporary employee against fraternizing with African-American employees, but Collier-Bond did not hear the comment herself and learned about it from the temporary worker. Other harassment Collier-Bond describes includes being unable to combine her lunch with her afternoon break, being denied the access code for the shortcut to the lunchroom, having her work closely monitored, and being warned about excessive absenteeism. She was fired in February of 2004 for attendance problems.

Collier-Bond filed a charge of discrimination with the EEOC and Illinois Department of Human Rights on November 30, 2001, and received a right to sue letter on December 14, 2001. In the plaintiffs' complaint she repeats the allegations of discrimination she made in her EEOC charge, namely that Menasha failed to promote her (Count VIII), subjected her to a hostile work environment (Count IX), and demoted her (Count X), all because of her race.

## II. DISCUSSION

### A. Motion To Strike

The defendants have asked the court to strike the plaintiffs' Amended Consolidated Brief in Response to Defendants' Motion for Summary Judgment. In support, the defendants argue that the plaintiffs not only added record citations to their response as directed by the court, but also made wholesale revisions to the response, which the court warned plaintiffs not to do.

The court has compared the plaintiffs' amended response with their original and agrees with the defendants that the plaintiffs have revised their response beyond adding recording citations. For instance, the plaintiffs added an entire discussion at Section I, subsection H, on Menasha's alleged failure to properly train supervisors how to handle reports of discrimination. Elsewhere the plaintiffs made substantive changes to their description of the facts, such as reducing the number of trailers stolen from Menasha prior to Bovia's termination from two to one.

Nevertheless, the court finds it unnecessary to determine whether any of these revisions should be stricken. None of the revisions strike the court as particularly helpful to the plaintiffs, and even if the court leaves their amended response intact, the defendants will still prevail on the motion for summary judgment. Accordingly the motion to strike is denied.

### B. Standard on a Motion for Summary Judgment

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Valenti v. Qualex, Inc.*, 970 F.2d 363, 365 (7th Cir. 1992), *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Moreover, a court should grant a motion for summary judgment only when the record shows that a reasonable jury could not find for the nonmoving party. *Valenti*, 970 F.2d at 365; *Anderson*, 477 U.S. at 248.

Thus, in order to withstand a motion for summary judgment, the nonmoving party must show that a dispute about a "genuine" material fact exists; that is, the evidence is such that a reasonable jury could render a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248. The nonmoving party may not merely rest upon the allegations or details in his pleading, but instead, must set forth specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

The determination as to what facts are "material" in employment discrimination cases depends upon the substantive law of employment discrimination, and the burden of proof applicable under the law. *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 922 (7th Cir. 1988). When considering motions for summary judgment in discrimination cases, the court applies these criteria with added rigor because the matters of intent and credibility are crucial issues. *Sarsha v. Sears, Roebuck, & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993).

## C.    Standard for Title VII and § 1981 Race Discrimination Claims

A plaintiff seeking relief under Title VII can prove discrimination using the "direct" method or the indirect, burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cerutti v. BASF Corp.*, 349 F.3d 1055,

1060-1061 (7th Cir. 2003). The same standards apply to claims brought under § 1981. *Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998). However, unlike Title VII claims that must brought within 300 days of the discriminatory act and must be exhausted before the EEOC before being filed in court, claims brought under § 1981 are subject to a four year statute of limitations, *Jones v. R.R. Donnelley & Sons, Co.*, 541 U.S. 369, 382 (2004), and do not need to be administratively exhausted, *Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003).

A plaintiff may thus attempt to use direct evidence to establish that her employer's decision to take an adverse job action against her was motivated by an impermissible purpose, such as race. *Cerutti*, 349 F.3d at 1061. Direct evidence is "evidence which if believed by the trier of fact, will prove the particular fact in question without reliance on inference or presumption." *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 443 (7th Cir. 1997). Direct evidence claims are rare because they essentially require the decision-maker to admit that she acted based upon the prohibited animus. *Cerutti*, 349 F.3d at 1061.

A plaintiff can also prevail using the indirect method of proof. This requires the plaintiff to construct a "convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotations omitted). In order to establish a prima facie case of disparate treatment using the indirect method, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly-situated

employees who were not members of the class were treated more favorably. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002).

A *prima facie* case of racial discrimination in the form of a hostile work environment is established with evidence that the plaintiff (1) was subject to unwelcome harassment; (2) the harassment was based upon the plaintiff's race; (3) the harassment was so severe or pervasive that it altered the conditions of the plaintiff's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability. For retaliation, a plaintiff establishes a *prima facie* case by showing that (1) she engaged in statutorily-protected speech; (2) she suffered an adverse employment action; and (3) the protected speech and adverse action were causally linked. *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005).

If the plaintiff establishes a *prima facie* case, the employer must then produce evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Wells*, 289 F.3d at 1006. If the employer proffers such a reason, the burden returns to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Id.* With these standards in mind, the court turns to the plaintiffs' discrimination claims, which are all based on the indirect method of proof.

**D.    Class Claims**

The plaintiffs have also attempted to allege three counts entitled "Pattern And Practice Of Race Discrimination," including discrimination in terminations (Count I), promotions and compensation (Count II), as well as discriminatory discipline and a hostile work environment (Count III). "Pattern and practice" is a method of showing disparate treatment in class action lawsuits. *See Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990); *Babrocky v.*

18

*Jewel Food Co.*, 773 F.2d 857, 866-67 n.6 (7th Cir. 1985); *see also Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001). Although the plaintiffs style their pattern and practice claims as class action claims, they never sought or received class certification. *See* Fed. R. Civ. P. 23(c)(1). Accordingly, they may not pursue these counts as class claims.

To the extent that the plaintiffs attempt to rely upon pattern and practice evidence to establish their individual claims of discrimination, they must do more than point to isolated incidents of discrimination. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984). Rather, they must show that gross statistical disparities between similarly situated employees of different races exist. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977). Indeed, statistical evidence is the heart of a plaintiff's *prima facie* pattern and practice disparate treatment case. *Bell v. EPA*, 232 F.3d 546, 533 (7th Cir. 2000).

The absence of statistical evidence to support their pattern and practice allegations is glaring. In lieu of statistical evidence, plaintiffs rely solely upon anecdotal evidence. While anecdotal evidence can supplement statistical evidence in support of a pattern and practice discrimination claim, *see Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 336 (1977); *Mozee v. Am. Commercial Marin Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991), as detailed below, even their anecdotal evidence does not establish a *prima facie* case of discrimination.

Accordingly, the plaintiffs' pattern and practice claims are improper, and the defendants are entitled to summary judgment on them.

## E.  Luckett

### 1.  Disparate Treatment

#### a.  Wrongful Demotion

Luckett alleges that shortly after a supervisor coaxed him into staying at Menasha by matching the higher salary offered to him by a potential employer, Menasha demoted him by transferring Collier-Bond, the one employee he supervised, to another department, and by reassigning his remaining supervisory responsibilities to someone else while requiring him to take on Collier-Bond's former duties. In order to establish a *prima facie* case that he was demoted based upon his race, Luckett must establish that he (1) is a member of a protected class; (2) was qualified for the job or meeting Menasha's legitimate expectations; (3) his alleged demotion amounted to an adverse employment action; and (4) Menasha treated similarly situated employees outside Luckett's protected class more favorably. *See Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 531 (7th Cir. 2003). If Luckett succeeds, Menasha must respond with evidence of a nondiscriminatory reason for its decision. *See Jordan v. City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005). If it does, then Luckett must offer evidence that Menasha's purported reason is untrue and just pretext for discrimination. *Id.* at 834.

The fact that Luckett's title, pay and benefits remained unchanged—and in the case of pay, actually increased—does not necessarily preclude his claim that he was demoted. *See Place v. Abbott Labs.*, 215 F.3d 803, 810 (7th Cir. 2000). Nevertheless Luckett must still set forth evidence that the changes Menasha made to his job responsibilities had a materially adverse effect, which Luckett has not done. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) ("An

20

adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities."). Although Luckett was left with no one to supervise, the ability to supervise other employees in one position is not a guarantee that the employee would forevermore have supervisory duties. *See Place*, 215 F.3d at 810 ("Supervising other workers in one capacity did not mean that person would always have supervisory duties thereafter."). Evidence that an employer changed an employee's job responsibilities over time does not establish that the employee suffered a materially adverse employment action. *See id.* (employees are not guaranteed that they will never be transferred to a different job); *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 691-92 (7th Cir. 2001) (changes in job responsibilities must have a materially adverse effect to be actionable). Not only has Luckett failed to establish a *prima facie* case because he has no evidence of an adverse employment action, but also because he has no evidence that an employee outside his protected group was similarly situated to him but not subjected to a similar change in duties. *See Jordan*, 396 F.3d at 835-36 (plaintiff must show that a similarly situated employee outside the protected class who was "directly comparable in all material respects" was treated better).

Even if Luckett had established a *prima facie* case of discrimination, he has failed to establish that Menasha's reason for shuffling his responsibilities was a pretext for discrimination. According to Menasha, the changes to Luckett's responsibilities were part of a cost-cutting measure that included hiring Brady, who in turn was directed to exact savings from carriers. Luckett has offered no evidence that these explanations are untrue, and has therefore failed to establish pretext. *See Leibforth v. Belvidere Nat'l Bank*, 337 F.3d 931, 933-34 (7th Cir.

21

2003) ("to establish pretext [plaintiff] had to prove that the [defendant]'s proffered reason was a *lie*").

### b.     Overtime

Luckett contends that on one occasion, he was not paid time-and-a-half for overtime that he had worked. Menasha concedes short-changing Luckett by not paying him time-and-a-half on one occasion. Nevertheless, Luckett has failed to establish a *prima facie* case of discrimination because he has not compared himself to any similarly situated employee outside his protected class who was not short-changed. *Cf.*, *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 979 (7th Cir. 2004) (plaintiff must identify comparable employee who was approved for overtime even though plaintiff was not). And he offers no evidence that the defendants are untruthful when they claim that the reason Menasha failed to pay Luckett for his overtime was a clerical oversight. *See Holmes v. Potter*, 384 F.3d 356, 361 (7th Cir. 2004) (plaintiff establishes pretext with evidence that the defendant's proffered reason for the adverse employment action had no basis in fact, was not the real reason, or was insufficient to warrant the adverse action); *Leibforth*, 337 F.3d at 933-34 (plaintiff must prove that defendant's proffered reason was a lie). He has therefore not established a *prima facie* case that because of his race Menasha failed to properly pay him for overtime.

### 2.     Hostile Work Environment

According to Luckett, the changes in his job duties coupled with instances of "ridicule, intimidation, embarrassment, and retaliation" created such a hostile work environment that he felt forced to quit in order to preserve "a little dignity." The ridicule and intimidation Luckett

describes for the most part involved difficulties with supervisors, including being questioned about "petty" matters, being scolded for using a wrong form to note an employee's tardiness, and being told in front of coworkers that his input was no longer needed.

While Luckett may have found his interactions with supervisors unpleasant, he has not described the kind of "hellish" environment that must exist in order to be an actionable hostile environment. See *McKenzie v. Milwaukee County.*, 381 F.3d 619, 624 (7th Cir. 2004) (plaintiff must show that she was subjected to harassment so severe or pervasive that it altered the conditions of her employment). Although Luckett's supervisors allegedly intimidated and scolded him, the boorish behavior he describes was infrequent and spread over the course of many months, amounting to normal workplace friction rather than actionable harassment. *See Herron v. DaimlerChrysler Corp*, 388 F.3d 293, 302 (7th Cir. 2004) (routine difficulties with managers are merely normal workplace friction). Furthermore, Luckett offered no evidence connecting these occurrences to his race. *See id.* (plaintiff must demonstrate a connection between the employer's conduct and his race). The mere fact that Luckett is a member of a protected class does not by itself establish that the alleged harassment was based upon his race. *See id.* (the fact that a plaintiff is a member of a protected class does not transform workplace gripes into claims of race discrimination). Without evidence that it was racially based, he cannot establish racial harassment.

### 3. Constructive Discharge

Luckett also contends that his work environment was so intolerable that he was forced to quit and that Menasha thus constructively discharged him. To show constructive discharge,

23

Luckett must not only establish that he was subjected to a hostile work environment, *see Rooney v. Koch Air, LLC*, 410 F.3d 376, 382-83 (7th Cir. 2005), but that the environment was so egregious that a reasonable employee would have been compelled to quit, *see Lifton v. Bd. of Educ.*, 416 F.3d 571, 578 (7th Cir. 2005). The working conditions for constructive discharge must be even more egregious than the high standard for hostile work environment because an employee is expected to remain employed while seeking redress. *Herron*, 388 F.3d at 303.

Having failed to establish that his work environment was hostile, Luckett necessarily cannot establish constructive discharge. *See Rooney*, 410 F.3d at 382-83 (plaintiff must establish a hostile environment in order to establish constructive discharge). Furthermore, the work environment he described falls far short of the intolerable conditions that support a claim of constructive discharge. *See, e.g., Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000) (employee subjected to repeated racist taunting and threats); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191 (7th Cir. 1992) (boss made racial comments and held gun to employee's head); *Brooms v. Regal Tube Co.*, 881 F.2d 412, 417 (7th Cir. 1989) (manager showed employee racist pornographic photos and threatened to kill her).

Accordingly, summary judgment is granted to the defendants on Counts XV and XVI.

### F.     Bovia

#### 4.     Disparate Treatment

##### a.     Wrongful Termination

As noted above, to establish a *prima facie* case, Bovia must establish, among other things, that he was meeting Menasha's legitimate expectations and that Menasha treated

similarly situated employees who were not African-American more favorably. *See Ineichen v. Ameritech*, 410 F.3d 956, 959 (7th Cir. 2005). It is undisputed that Bovia did not follow Menasha's security policies and that a trailer was stolen as a result. Thus, Menasha claims that Bovia was not meeting its legitimate expectations. Bovia, on the other hand, asserts that he was an otherwise exemplary employee, that Paredes told him not to block the trailer, and that the white employees with trailer keys were not disciplined.

As a general rule, an employee's admission that he violated a work rule is enough to establish that an employee did not meet his employer's legitimate expectations. *See Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001). Moreover, an employee's testimony disputing his employer's assessment of his job performance is not sufficient to establish a *prima facie* case of discrimination. *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 843 (7th Cir.1996) (summary judgment for employer appropriate where employee's contention of satisfactory performance contradicted employer's evidence of negative performance). Thus, Bovia's contention that he was an otherwise exemplary employee is not enough to establish that he was meeting Menasha's legitimate expectations.

The court next considers Bovia's claim that the theft was not his fault because Paredes instructed him not to block the trailer in, so the trailer incident is not germane to whether Bovia was meeting Menasha's legitimate expectations. The court does not sit as a super-personnel department to second-guess an employer's decisions. *Ghosh v. Ind. Dep't of Envtl. Mgmt.*, 192 F.3d 1087, 1093 (7th Cir.1999). An employer may also choose to believe one employee over

another or even choose to ignore contrary evidence. *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 920 (7th Cir. 2001).

Here, Bovia testified that he did not know what Paredes' intentions were when he told Bovia not to block the trailer. He also testified that Marek could have chosen to believe Paredes due to office politics. This evidence, along with Bovia's personal belief that Menasha acted out of race-based animus or that it did not conduct an adequate investigation into the circumstances surrounding the theft, does not create a fact question regarding the basis for Marek's decision to terminate Bovia. *See Gusewelle v. City of Wood River*, 374 F.3d 569, 576 (7th Cir. 2004) (focusing on whether the decision-maker honestly believed an employee had violated a rule); *Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir. 1997) ("the question is not whether the [employer's performance] ratings were right but whether the employer's description of its reasons is honest").

The court also notes that Menasha's alleged failure to follow its progressive disciplinary policy is not enough, by itself, to show that the trailer incident is irrelevant for the purposes of considering whether Bovia was meeting Menasha's legitimate expectations. *See Barakat v. Taco Bell, Inc.*, 970 F. Supp. 634, 640 (N.D. Ill. 1997). Finally, with respect to whether Menasha treated other non-African-American similarly-situated employees more favorably, Bovia points to the prior trailer theft and notes that no one was fired as a result of that prior theft. The record, however, does not contain any evidence which would allow the court to see if the employees involved in that incident were in fact similarly situated. *See Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004) (affirming grant of summary judgment when plaintiff failed to

point to any evidence in the record demonstrating that other similarly situated employees who did not file a charge of discrimination were treated more favorably).

Thus, Bovia has failed to establish that he was meeting Menasha's legitimate expectations and that Menasha treated other non-African-American similarly-situated employees better. This means that he has not met his burden of setting forth a prima facie case of discrimination. The court does not wish to deprecate Bovia's personal belief as to why he was terminated. This belief, however, is not enough to withstand Menasha's motion for summary judgment under the framework set forth by the Supreme Court and the Seventh Circuit. Accordingly, the court grants Menasha's motion for summary judgment as to Bovia's wrongful termination claim.

### b. Personal Time

Bovia contends that he was not treated as favorably as a non-African-American employee, specifically Tracy Smith, who was allowed time off to attend to personal matters while Bovia was once denied a request for a day off. But according to Bovia, Smith worked in a different department and reported to a different supervisor. Because the evidence fails to establish that Smith was similarly situated to Bovia, he has failed to establish a *prima facie* case of discrimination. *See Sartor v. Spherion Corp.*, 388 F.3d 275, 279-80 (7th Cir. 2004) (to be similarly situated, employees must be comparable in all respects). Furthermore, Bovia has failed to establish pretext because he offers no evidence that Menasha's reason for denying Bovia's request for a day off—that no one was available to cover his shift—was a lie. *See Ineichen,* 410

F.3d at 961 (the only question is whether the employer's proffered reason was pretextual, meaning that it was untruthful).

Accordingly, summary judgment is granted to the defendants on Counts IV and V.

### G.    Lipscomb

#### 1.    Disparate Treatment

##### a.    Failure To Promote

Lipscomb alleges that Menasha failed to promote him because of his race not once but twice. First, he alleges that in October 2000, Menasha decided to hire a white employee over him to be first-shift dock supervisor. Then in April 2001, Menasha decided to hire a non-African-American employee over him to replace second-shift dock supervisor Adrian Bovia after Bovia's termination.

Lipscomb has established the first element of his *prima facie* case that he was qualified for the promotion to first-shift dock supervisor—Menasha temporarily placed him in that position and presumably thought he could do the job. However, he has failed to establish that the person hired, Chuck Mackin, was only "similarly or less qualified." To the contrary, Lipscomb concedes that Mackin had years more experience in dock supervision than he had and was therefore *more* qualified than Lipscomb. *See Sartor*, 388 F.3d at 279-80 (plaintiff was not similarly situated to a better qualified job candidate). Accordingly, Lipscomb has failed to establish a *prima facie* case that Menasha's decision not to promote him to be first-shift dock supervisor was discriminatory.

Lipscomb has also failed to establish a *prima facie* case that Menasha passed him over for a promotion to be second-shift dock supervisor. Lipscomb concedes that he never applied for that vacancy as he had for the first-shift dock supervisor position. An employer is not required to offer promotions to employees who do not apply for them. *Sembos v. Philips Components*, 376 F.3d 696, 702 (7th Cir. 2004) ("An employer cannot be liable for failing to hire a person who does not apply for a job."). Although he contends that he told two other people he was interested in the vacancy, one of those persons had no authority to fill the vacancy and Lipscomb is not sure the other even heard him. Without evidence that he applied for or at least expressed an interest in the second-shift vacancy, Lipscomb cannot establish a *prima facie* case of discrimination. *Id.*

### b.     Wrongful Demotion

Lipscomb alleges that he was demoted when Menasha removed him from the first-shift dock supervisor position he held until Menasha hired Mackin to permanently fill the vacancy. But he has not established that by returning to his permanent position, he suffered an adverse employment action. *See Griffin*, 356 F.3d at 829 (plaintiff must demonstrate a materially adverse change to job). In fact, he has not even established that he was demoted: he admits that he held the first-shift dock supervisor position only temporarily. *Id.* Furthermore, Lipscomb has failed to identify similarly situated employees outside his protected class allegedly treated better. *McKenzie*, 381 F.3d at 625-26. He has therefore failed to establish even that he was demoted, let alone a *prima facie* case that Menasha acted based upon his race.

### c. Overtime

According to Lipscomb, Menasha enforced its new policy on overtime—requiring employees to obtain permission before accruing it—in a discriminatory manner. Specifically, he contends that his requests to work overtime were regularly denied while the requests of non-African-American employees were granted. While Lipscomb was understandably displeased that he could no longer substantially supplement his base pay with overtime, he has failed to show that employees outside his protected class who were allowed to work overtime were similarly situated to him. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-19 (7th Cir. 2000) (in determining whether employees are similarly situated, courts look to all factors including whether the employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct). He has offered no evidence to show what those other employees' job duties were and how they compared to his. He has also failed to show whether the work those employees performed during overtime was the same type of work he had requested overtime in order to perform. *Cf. Wyninger*, 361 F.3d at 979 (plaintiff must show that the type of overtime she was denied approval to perform was the same type of overtime other employees received approval to perform). The only evidence in the record describing these other employees establishes that they were not similar to Lipscomb. They were classified as Tech I employees, while Lipscomb was a Tech II. As a result, their hourly rates were all lower than Lipscomb's. In order to establish a *prima facie* case that Menasha enforced its overtime policy in a discriminatory manner, Lipscomb needed to show that these other employees were

similar to him. *See Radue*, 219 F.3d at 617-19. By failing to do so, he has failed to establish a *prima facie* case of race discrimination.

Additionally, Lipscomb has offered no evidence that Menasha's reason for granting the overtime requests of the non-African-American employees, but not his, was pretextual. In order to establish pretext, Lipscomb needed to show that the defendants' proffered reason—that the other employees' hourly rates were lower—either (1) had no basis in fact; (2) did not actually motivate the adverse employment action; or (3) were insufficient to motivate the adverse employment action. *See Holmes*, 384 F.3d at 361. Because he has offered no evidence to establish any of these points, Lipscomb has failed to establish pretext.

### d.    Discriminatory Discipline

Lipscomb was disciplined repeatedly for violating company policies, including timecard and forklift policies, as well as for misreporting inventory and for insubordination. For some of the violations he received only verbal or written warnings, while for others he was suspended. Lipscomb's repeated violations of company policies, therefore, makes clear that he was not meeting his employer's legitimate expectations as normally required to establish a *prima facie* case of discrimination. *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (setting forth elements of a *prima facie* case of discriminatory discipline). However, this does not doom his attempt to establish a *prima facie* case because when a plaintiff alleges discriminatory discipline, the second and fourth prongs of the *McDonnell Douglas* inquiry merge. *Id.* ("To the extent that the plaintiff claims that he was subject to disparate punishment . . . the second and forth prongs of *McDonnell Douglas* merge."). Therefore a

plaintiff need show only that similarly situated employees outside his protected class committed similar violations of company policy but were disciplined less harshly. *Id.* at 728.

Lipscomb identifies a similarly situated, better-treated employee for only one violation—the timecard violation—in which Lipscomb failed to properly date his card and for which he received a written warning. According to Lipscomb, a Hispanic employee committed a similar timecard violation but received no written warning. The only evidence he offers that the Hispanic employee received no written warning, however, is Lipscomb's own speculation. This is insufficient because material offered to defeat a motion for summary judgment must be "of evidentiary quality." *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 899 (7th Cir. 1999). Moreover, assertions must be based upon personal knowledge, not mere speculation. *Waite v. Bd. Of Trs. of Ill. Cmty. Coll. Dist. 508*, 408 F.3d 339, 346 (7th Cir. 2005) (unsubstantiated claims do not raise a genuine issue of material fact).

As for Lipscomb's other violations, although he contends that non-African-Americans would not have been disciplined for them or would have received less severe discipline than the warnings and suspensions he received, he has pointed to no evidence of violations similar to his. Likewise, he has pointed to no evidence of similarly situated employees outside his protected class who were disciplined less harshly for similar violations. Therefore, Lipscomb has again failed to establish a *prima facie* case of race discrimination because he has failed to identify any similarly situated employees who were treated more favorably. *See Lucas*, 367 F.3d at 728.

## 2.  Hostile Work Environment

Lipscomb alleges that Menasha management attempted to "embarrass and humiliate" him in front of coworkers for various misconduct. For instance, he contends that management wrote the word "SUSPENDED" in bold across his timecard for all to see, escorted him out of the workplace after suspending him, and required him in front of coworkers to initial a written report of an error he made loading a trailer.

In order to establish that incidents amount to racial discrimination based upon a hostile work environment, Lipscomb must show that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability. *See Herron*, 383 F.3d at 302. In determining whether a work environment is hostile, courts review all the circumstances, including the frequency of the conduct, its severity, and whether it is physically threatening or humiliating or a mere offensive utterance. *Id.* at 303.

Though embarrassed by these incidents, Lipscomb has failed to show that they created the type of "hellish" conditions that would support a hostile work environment. *See McKenzie*, 381 F.3d at 624 (a hellish workplace is one where the hostile environment is so severe or pervasive that it altered the conditions of the plaintiff's employment). According to the record, each incident was precipitated by Lipscomb's violation of company policy and Lipscomb has offered no evidence that Menasha's handling of his infractions were anything other than legitimate attempts to discipline him. Furthermore, Lipscomb has offered no evidence showing

any connection between these occurrences and his race. *See Herron*, 388 F.3d at 302-03 (a

plaintiff must demonstrate a connection between the employer's conduct and his race). To the

contrary, he concedes that he never observed any conduct by any supervisor or manager that he

perceived to be derogatory towards African-Americans. The mere fact that Lipscomb is a

member of a protected class does not by itself establish that the alleged harassment was based

upon his race. *Id.* (membership in a protected class does not transform workplace gripes into

claims of racial discrimination). Without evidence that the conduct was racially based, he

cannot establish racial harassment.

### 3. Retaliation

Lipscomb filed a charge of discrimination with the EEOC on June 25, 2001. A little over

a month later, he received a one-day suspension for cursing at two supervisors who had just

reprimanded him for improperly loading a trailer. Lipscomb alleges that he also began to

receive more difficult work assignments. The following year, and just a couple of weeks after

giving his deposition in this case, Menasha changed Lipscomb's schedule, requiring him to start

each morning at 6:45, more than three hours earlier than he had been starting. Displeased,

Lipscomb muttered something which a supervisor perceived to be a threat. For the threat,

Lipscomb received another suspension, this time for three days.

Lipscomb contends that Menasha's acts were in retaliation for the charge of

discrimination he filed. Although the instances of alleged retaliation did follow closely after

Lipscomb filed his charge and gave his deposition, he makes no attempt to show a causal

connection between the events, a requirement for establishing retaliation under the direct method

of proof. *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (plaintiff must present evidence that her adverse employment action is causally connected to her statutorily protected activity). Indeed, evidence of suspicious timing alone is insufficient to create an inference of a causal connection. *Oest v. Ill. Dep't of Corrs.*, 240 F.3d 605, 616 (7th Cir. 2001) (speculation based upon suspicious timing alone does not create an inference of retaliation). Instead, Lipscomb relies upon the indirect *McDonnell Douglas* method, which requires him to present evidence that (1) he engaged in statutorily-protected expression; (2) he was performing his job according to Menasha's legitimate expectations; (3) despite meeting those expectations he suffered an adverse employment action; and (4) he was treated worse than similarly situated employees who did not engage in protected expression. *See Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005); *Luckie*, 389 F.3d at 714.

Lipscomb has failed to establish that his suspensions were discriminatory because he offers no evidence under either the second or fourth prong of the indirect method. He does not deny the conduct for which he was suspended, including cursing at two supervisors and muttering something under his breath which a supervisor believed was a threat (though Lipscomb denies that it was a threat). Therefore, he was not performing his job according to Menasha's legitimate expectations. *See Mannie*, 394 F.3d at 984 (to establish discrimination, plaintiff must first show that he performed his job satisfactorily). He has also failed to identify any employee who did not complain about discrimination and who committed similar infractions but was not suspended. *See id.* (plaintiff must show that similarly situated employees outside the

protected class were treated better). To the contrary, according to the record, Menasha had also suspended a Hispanic employee for cursing at a supervisor.

As for the change to Lipscomb's schedule and the cold-shoulder reception he received from some coworkers, he has failed to establish that he suffered an adverse employment action under the third prong of the indirect method. *See id.* In fact, as Lipscomb admits, the change was Menasha's attempt to create uniform shift schedules, and all first-shift employees like Lipscomb were required to start each morning at 6:45.

Accordingly, Lipscomb has failed to establish a *prima facie* case of discrimination, and summary judgment is granted on Counts XI, XII, XIII and XIV of the plaintiffs' complaint.

## H. Hostile Work Environment – Stinson, Carter, Collier-Bond

Before continuing individually with the remaining plaintiffs (Stinson, Carter, and Collier-Bond) the court reviews collectively one of their claims—that they were subjected to a hostile work environment. All three women started at NCS's Greenwood facility and transferred to Menasha's Alsip facility after Menasha bought NCS. At Alsip, all three worked together in the customer service department and for much of the time were the department's only employees.

All three complain of several incidents of harassment they contend were racially motivated. First, they did not receive shirts with the Menasha logo on it even though employees in the all-white telemarketing department received them. Second, they could not take the shortcut through an office to the lunchroom because they were denied the office door's access code, even though telemarketing employees had the code. Third, at a plant meeting a supervisor referred to the three customer service employees as "you people." Fourth, the three customer

36

service employees had to stagger their lunch breaks and could not combine their 30-minute lunch break with their 15-minute afternoon break, while telemarketing employees could lunch together and combine breaks.

In addition to the alleged harassment the three women experienced together, Stinson and Collier-Bond describe alleged harassment they experienced individually. Stinson contends that Menasha harassed her by requiring her to obtain permission to work overtime, making her the only supervisor who needed permission. As for Collier-Bond, she contends that she was harassed when a supervisor closely monitored her work, warned her about excessive absenteeism, yelled at her during a performance evaluation, and when she discovered that a temporary employee had been warned by Tracy Smith against fraternizing with African-American employees.

Racial epithets have no place in the workplace, whether they are explicit warnings against fraternizing with minorities, or more covert like the phrase "you people." Nevertheless, in order to establish a hostile work environment claim, Stinson, Carter and Collier-Bond must show not only that racial epithets were used, but that their use was "so severe or pervasive" that it "alter[ed] the conditions of employment." *See Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005). The epithets plaintiffs describe, including use of the phrase "you people," along with the allegedly discriminatory distribution of company t-shirts, were isolated. Because they occurred infrequently, they cannot be characterized as being particularly abusive or hellish. *See Whittaker v. No. Ill. Univ.* No. 04-3759, slip op. at 8 (7th Cir. Sept. 21, 2005); *Mannie*, 394 F.3d at 982-83; *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 271-72 (7th Cir.

2004) (even highly offensive epithets are not abusive if infrequent). Likewise, though the plaintiffs may have been irritated by Menasha's policies limiting access to the lunchroom and dictating break schedules, these policies cannot be characterized as abusive. *Id.*

The plaintiffs have also failed to establish that the behavior altered the conditions of their employment. To do so, a plaintiff must show that the conduct they described either resulted in a tangible employment action, or left them unable to perform their jobs. *Mannie*, 394 F.3d at 983. Stinson, Carter and Collier-Bond have identified no adverse employment action they attribute to the alleged harassment. Likewise, they do not contend that the alleged harassment left them unable to perform their jobs; to the contrary, they have each alleged that they performed their jobs satisfactorily.

Also fatal to these plaintiffs' hostile work environment claims is their failure to establish that any of the behavior they described was motivated by race. At first glance the defendant's behavior appears suspicious—white telemarketing employees were bestowed with company shirts, access codes, and preferential break schedules, while black customer service employees were denied these privileges. But the mere fact that a plaintiff belongs to a racial minority does not by itself demonstrate discriminatory motive. *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863-64 (7th Cir. 2005) ("not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority."). The plaintiffs have offered no admissible evidence connecting their allegedly unfair treatment to animus against African-Americans. The only evidence of animus they offer is Collier-Bond's deposition testimony recounting what the temporary employee told Collier-

38

Bond about Smith's alleged statement. As such, it is double hearsay and inadmissible. *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (hearsay statements are inadmissible in summary judgment proceeding). Plaintiffs offer no evidence permitting application of any of the exceptions to the hearsay rule, and accordingly the hearsay statement must be excluded for purposes of summary judgment. *Id.*

On the other hand, the record reveals alternate, non-discriminatory reasons to explain Menasha's treatment of its customer service representatives. For instance, Menasha prohibited customer service representatives from lunching together and combining breaks in order to provide continuous coverage of customer's incoming calls. Telemarketing employees did not handle incoming calls for customer service and therefore could be afforded more freedom in scheduling their breaks.

Concerns over security were Menasha's non-discriminatory reason for restricting access to the shortcut through the office to the lunchroom. According to the defendants, in the past everyone could access the shortcut, but on numerous occasions people left the door open allowing even non-employees to wander into the office. In their responses to the defendants' statements of fact, plaintiffs even concede that security was Menasha's reason for placing the key code device on the office door in order to restrict access. Over time, however, it appears from the record that the access code was passed from employee to employee, including to the telemarketing employees, and even eventually to Stinson.

As for Stinson's overtime, Menasha required her to obtain permission because she was an hourly employee, whereas the supervisors who did not need permission were salaried.

39

Because Stinson, Carter and Collier-Bond have failed to offer evidence that their workplace was hellish or that supervisors' behavior was motivated by race, each of them has failed to establish their hostile work environment claim.

## I. Stinson

### 1. Disparate Treatment

#### a. Failure To Promote

Returning to the remaining claims individually, Stinson contends that Menasha passed her over for a promotion to office manager, and instead promoted a white employee. She admits, however, that she never applied for the promotion and never discussed her interest in it with anyone at Menasha. Because an employee may establish discrimination based upon a failure to promote only by showing that she either applied for the promotion or at least expressed an interest in it, *see Sembos*, 376 F.3d at 702, Stinson may not establish that Menasha discriminated against her by failing to promote her to a position that she never sought.

#### b. Wrongful Demotion

Stinson identifies two instances in which she contends she was demoted: first, when Tanya Burderlik became office manager and usurped her ability to supervise the other customer service employees, and again when Tracy Smith transferred to the customer service department and took over her responsibilities for handling paperwork. She admits, however, that her salary and benefits remained the same.

Without elaboration Stinson also points generally to "all employees in the telemarketing department" as evidence that other employees similarly situated to her were not demoted.

Without any argument or explanation from Stinson, the court cannot even guess which, if any, telemarketing employees were similarly situated to her. *See Hudson*, 375 F.3d at 560 (affirming grant of summary judgment when plaintiff failed to point to any evidence in the record demonstrating that other similarly situated employees were treated more favorably); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("a district court is not required to 'scour . . . the party's various submissions to piece together appropriate arguments'").

Stinson has also failed to establish that she suffered an adverse employment action. As discussed earlier, being relieved of supervisory responsibilities is not materially adverse. *Place*, 215 F.3d at 810 ("Supervising other workers in one capacity did not mean that person would always have supervisory duties thereafter."); *see also O'Neal*, 392 F.3d at 912 (to sustain claim of wrongful demotion plaintiff must show something more than the ordinary difficulties associated with a job transfer); *Griffin*, 356 F.3d at 829 (change in job responsibilities is not a materially adverse employment action).

Furthermore, Stinson admits that Menasha had a legitimate reason for transferring Smith to the customer service department to take over some of Stinson's responsibilities: the company wanted to separate Smith from John Brady while it investigated Smith's allegations that Brady sexually harassed her. Stinson therefore cannot establish pretext. *See Leibforth*, 337 F.3d at 933-34 (to establish pretext the plaintiff must show that the employer's proffered reason for its conduct was a "lie").

### c.    Discriminatory Discipline

Stinson asserts that she was disciplined more harshly than non-African-Americans when she received written warnings for billing errors and for violating Menasha's dress code by wearing denim jeans. She does not, however, identify any similarly situated non-African-American employees who did not receive written warnings despite similar conduct. She only speculates that non-African-Americans were not written up for billing errors, but speculation is insufficient to establish a *prima facie* case of discrimination. *See Waite*, 408 F.3d at 346 (unsubstantiated assertions and speculation do not raise a genuine issue of material fact). As for the dress code violations, although Stinson identifies non-African-American employees who were not reprimanded for wearing denim, those employees are not similarly situated for two reasons. First, they worked in a different department and Stinson offers no evidence that they reported to the same supervisor to whom she reported. *See Ineichen*, 410 F.3d at 960-61 (to be similarly situated employees must report to the same supervisor and engage in the same conduct). Second, according to the record the other employees wore denim shirts, while the written dress code prohibits only denim jeans.

### d.    Discriminatory Compensation

Stinson also alleges that she was the only non-salaried supervisor and was paid less than comparable employees because of her race. Although Stinson was the only non-African-American supervisor paid hourly, from the record she also appears to have been the only supervisor brought over from NCS, where she had also been a supervisor paid hourly. To establish a *prima facie* case of discrimination, she would need to show that a similarly situated

employee was treated better—specifically she would need to compare herself to another supervisor outside her protected class who was paid hourly by NCS but made salaried by Menasha. *See Sartor*, 388 F.3d at 279-80 (to be similarly situated, employees must be comparable in all respects). But Stinson has offered no such evidence. In fact, from the record it appears that she was the only Menasha supervisor who previously worked at NCS.

As for her claim that she was paid less than comparable employees outside her protected class, she has failed to show that the other employees are similarly situated. The employees she compares herself are not similarly situated because they did not work in the same department as Stinson: Silvia Perez worked in the claims department while Tracy Smith worked in the dispatch department. *See Radue*, 219 F.3d at 617-18 (similarly situated employees report to the same supervisor and engage in the same conduct). Because Stinson has failed to identify any similarly situated employee treated better than herself, she has not established a *prima facie* case of discrimination.

Accordingly, summary judgment is granted to the defendants on Counts XVII, XVIII, and XIX.

### J. Carter

#### 1. Disparate Treatment

##### a. Failure To Promote

Like Stinson, Carter contends that Menasha passed her over for promotions based upon her race. Also like Stinson, she concedes that she never applied for the promotions and never discussed her interest in them with anyone at Menasha. Accordingly, Carter may not establish

that Menasha discriminated against her by failing to promote her. *See Sembos*, 376 F.3d at 702 ("An employer cannot be liable for failing to hire a person who does not apply for a job.").

### b. Discriminatory Discipline

Carter alleges that her errors were logged while those of a white employee were not, and therefore she was disciplined more harshly than non-African-American employees. But the white employee to whom she compares herself—Amy Benson—worked in telemarketing and reported to a different supervisor. Because Benson worked in a different department and reported to a different supervisor, Carter cannot show that she and Benson were similarly situated. *See Ineichen*, 410 F.3d at 960-61 (to be similarly situated, employees must report to the same supervisor and engage in the same conduct). Likewise, the white employee who was not sent home for wearing knee-high stockings even though Carter was sent home for the same violation also worked in a different department and reported to a different supervisor. *See id.* Therefore, Carter has not shown that she was treated worse than similarly situated non-African-American employees and cannot establish a *prima facie* case of race discrimination.

Accordingly, summary judgment is granted to the defendants on Counts VI, and VII.

### K. Collier-Bond

#### 1. Disparate Treatment

##### a. Failure To Promote

Though Collier-Bond hoped to be promoted to a supervisory position, she was passed over and Menasha gave the promotion to a white employee instead. But like other plaintiffs, Collier-Bond admits that she never applied for the opening or expressed any interest in it.

44

Therefore, she cannot establish that Menasha's decision to promote a white employee rather than her was discriminatory. *See Sembos*, 376 F.3d at 702 (employees must apply for new jobs or express an interest in them).

### b. Wrongful Demotion

Collier-Bond alleges that she was demoted when Menasha transferred Tracy Smith from the dispatch department to customer service. After the transfer, Menasha reassigned some of Collier-Bond's duties to Smith, and required Collier-Bond to serve as a file clerk. She admits, however, that her pay and benefits were unaffected.

Like Stinson, Collier-Bond also contends only generally, without elaboration, that she was similarly situated to "all employees in the telemarketing department." As discussed above, by failing to point to any evidence of a specific telemarketing employee who was similarly situated to Collier-Bond but who was not demoted, Collier-Bond has failed to establish a *prima facie* case of discrimination. *See Hudson*, 375 F.3d at 560; *Little*, 71 F.3d at 641. Furthermore, Collier-Bond has failed to establish that the changes in her job responsibilities were materially adverse. *See O'Neal*, 392 F.3d at 912 (to sustain claim of wrongful demotion plaintiff must show something more than the ordinary difficulties associated with a job transfer); *Griffin*, 356 F.3d at 829 (change in job responsibilities is not a materially adverse employment action).

Collier-Bond also admits that Menasha's investigation into Smith's claims that Brady sexually harassed her was a legitimate, nondiscriminatory reason for transferring Smith to the customer service department and reallocating employee's work. *See Leibforth*, 337 F.3d at 933-

45

34 (to establish pretext the plaintiff must show that the employer's proffered reason for its conduct was a "lie").

Accordingly, summary judgment is granted to the defendants on Counts VII, IX, and X.

## III.    CONCLUSION

For the foregoing reasons, the defendants' motion to strike [44-1] is denied, while the motion for summary judgment [33-1] is granted on all counts of the amended complaint. The clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket.


DATE:    September 29, 2005

Blanche M. Manning
U.S. District Court Judge